May it please the Court, I'm Andrew Bodell, Counselor for Herbert Liverman and Vance Richards. In this case against the City of Petersburg and the Police Chief, John Dixon, this case concerns the First Amendment rights of public employees, specifically my clients, former police officers of the City of Petersburg. I ask the Court to reverse aspects of the trial court's grant of summary judgment and its award of attorney fees. I assume the Court is familiar with the facts of the case. In summary, counts 1 and 2 of this case claim the Department's social networking policy is unconstitutional. The policy was established in 2010 and again in 2013 by Chief Dixon, the Chief of Police at the time, as a general order governing the Department of Employees and Officers. Counts 3 and 4 claim that discipline under the 2013 policy was unconstitutional. Liverman and Richards were disciplined for Facebook comments they made while off-duty speaking as citizens on June 17, 2013. Counts 5 and 6 relate to later retaliation. In October 2013, Counselors for Liverman and Richards notified the City about their First Amendment claims. Over the following months, Liverman and Richards were each subjected to further administrative investigations and disciplinary actions that they believed to be retaliatory. So those are the three types of claims that we're bringing. With each of these, we'll discuss the standards and how they apply. We will also discuss qualified immunity and the issue of municipal liability. First, with respect to counts 1 and 2, and this concerns the policy itself, there are two closely related legal tests at issue. There's the Pinkering test, and then there's what's called the Pinkering slash NTEU test, which I'll call the NTEU test for clarity's sake. Pinkering relates to employment discipline for protected speech on a particular occasion in the absence of a policy. The NTEU test applies to policies that regulate at least some protected speech. Just to try to get the nomenclature straight here, I thought there was a negative comments provision and then the public concern provision. Yes, that's fine. We can call it the negative comments and the public concern, yes. When you start getting into the alphabet. Yeah, I understand completely. But the NTEU test is the legal test arising out of the United States NTEU case, which is a modification of the Pinkering standard. Tell me the two terms we're using again so I can keep up. Maybe the same problem. With regard to the negative comment section and also the public concern section. Those are the two different sections of the policy at issue. Now, with respect... Of the two, which do you think is the more iniquitous? Well, it's difficult to say because the court has to read the policy as a whole. And there's disputes as to how to read that policy. But even if the court reads the policy in the light that the defendants want you to read it, it's going to be unconstitutional. Because when we get to the public concern comment section, it doesn't use a balancing test. It uses a bright-line rule. This public concerns comment says, all right, if you're speaking on a matter of public concern, you can go ahead and do so. So long as you don't cross this line. So long as you don't damage the department or cause concerns. And since Pinkering, the entire test is... Why isn't that a balancing test? You know, I read these two provisions, and I got considerably more heartburn over the negative comments. Well, it's easiest to say, it's easiest to show that that's not balancing by inserting... The court often inserts racial discrimination. I mean, the negative comments provision seemed to me to say, you just can't criticize the police chief or the bureau or anything about anything. And I agree completely with that. That's our reading of the policy as well. It struck me as pretty overbroad, but... I completely agree, and that's... Wait, hold on. Excuse me. I love lawyers who are enthusiastic about their case, but I need to ask a question here. The public concern provision seemed more within the confines of CONIC. And it allows comment on public concern, but then it balances the so long as you say there's no balancing, but the so long as provision about disruption of the workplace and everything are some of the things that CONIC referred to as part of the balance, and the Pinkering-CONIC balance. And then it says at the end, the instances must be judged on a case-by-case basis. So I guess what I'm asking you is, one of these provisions seems to me, just reading it off the top, really has serious constitutional infirmities. But the other one seems a good faith effort to come within the... more within the confines of CONIC Pinkering and to reflect the balancing. Well, I can agree with everything you've said, except for the fact that it reflects the balancing. And the reason why I say it doesn't is because the Pinkering test from the beginning has been designed to address those circumstances precisely where an employee's speech causes issues with the department. And when it causes issues with the department, then we have to engage in a balancing test. Okay, well, with all of the problems you've caused... Why don't you get down to the specifics here about, you know, the specific communications that Livermore and Richards engaged in and why you think they were protected or unprotected or why you think they were protected and why you think the sanctions applied to both offices were incorrect. All right, certainly. Can I get him to just answer a yes or no question for you? Yes. Absolutely. Do you agree or disagree with the analysis used by the district court on this facial challenge for counsel? I disagree with the analysis. All right, that's good. And if I... No, I don't want you to throw it. I don't want to throw it at you all. Well, I can address that quickly. Essentially, I believe the court adopted an element of Pinkering and inserted it into the NTU test. Namely, they required Livermore and Richards to prove speech on a particular occasion to be a matter of public concern rather than looking at the matter broadly with hypotheticals as this case. I'll point specifically to the Mansour v. Trank case. I don't know that this was cited in the briefs, but it's... I'm sorry. I threw you all. No, I'm fine. No, but I don't want to. I'll return. All right. I'll go back to Judge Wilkins. Looking at the specific comments, you'll find the comments on page 398 through 400 of the appendix. Now, the lower court found that Livermore's comments were matters of public concern. It found that the comments, when you weighed them in the Pinkering balancing test, favor Liverman, and they found that, therefore, this was a protected speech and the discipline violated his First Amendment rights. That's what the court found with respect to Liverman. The air of the court was then to say, but they're protected by qualified immunity or municipal liability. With respect to Richards, the court found that his comments were merely personal grievances, not a matter of public concern. So there were different conclusions as to each of these statements. To address the issue of Richards, we believe that the court misconstrued the standard and how it applies to his comments. Richards was speaking on a matter of public concern. He engaged in a dialogue with Liverman. Under the Connick v. Myers case, if one part of that dialogue, one part of that correspondence is a matter of public concern, the entire thing is a matter of public concern. The court focused instead on idiom-like, I'm with you, bro, to say that Richards' comments were replete with references to himself. Well, just to illustrate to the court the fact that references to yourself and your comments don't make it a matter of public concern. If I said this... What did you think about Mr. Richards' comments was a matter of public concern? It seems to me Liverman and Richards are in a little bit different situation here with respect to their comments, but maybe not. What is... Liverman, I can see the public concern that they're putting in as supervisors, policemen with very low levels of experience, rookies and everything, and that that's not a good thing to have inexperienced police officers supervising more experienced police officers. You can agree with it or not agree with it, but it seems important to discuss. The district judge felt Richards' statements related to the fact that he didn't receive a promotion. And now why was that... Why was the take with Richards wrong? First of all, he opens his comments by saying, well said, bro, I agree 110%. So he's agreeing with Liverman's statements. If Liverman's speaking about a matter of public concern, then agreeing with Liverman is speaking about a matter of public concern. He says not to mention younger officers being promoted in supervisor role. So he's building on what Liverman is saying. He's continuing that conversation, bringing up additional issues. This is not about Richards being promoted. There's nothing in the record indicating that Richards, at the time that he made this comment, was looking for a promotion. Promotional opportunities didn't arise for another couple months, and there had been no promotional opportunities, according to the record, since 1995. There was no indication that Richards was asserting himself for promotional... Did either of the officers make these comments public, or was it just an e-mail exchange between the two of them? It was a Facebook exchange. So we don't have... I don't know that the record shows all the privacy settings, but it was published on Facebook, which very often is a limited sort of forum. It's not always accessible to the general public, but accessible at least to the people you allow it to be accessible to. Let me ask you a question before you run out of time. If we agree that the district court used the wrong standard to evaluate your facial challenge, then we have to decide, don't we, whether we want to go on and address that ourselves or whether or not it needs to go back for the district court to apply the right standard initially. Isn't that a decision we would have to make? Yes, I believe so. And doesn't that decision have implications for other counts? Absolutely. I believe that, first of all, down the line, if it decides to send it back to the lower court for a decision on that issue, it's certainly going to affect the attorney fee issue. That is one part of the issue that we raised. It may also affect the other counts. The other counts do stand somewhat independent. And in a nutshell, tell me what your complaint with the district court's use of the standard was. Your chief complaint. As to which of these counts. To address each of them with regard to the facial count? I mean, what overall do you think was incorrect about the standard the district court utilized? The court merged the standards together, Pinkreen and the NTU standards. They merged them together, applied them to counts one through four without differentiating between the facial challenge, if we may use that term, and the specific discipline under counts three and four. I believe that there is a way in which, under the Sandor and Harmon case law, under which the court may look at it as fairly uniform analysis, but that approach would require applying the NTU test. The court instead applied the Pinkreen test. And so we do have issues with the way that the standards are applied, but the court is going to have to be specific which standard it is applying. The NTU test clearly applies to counts one and two, and the court got that wrong. The Sandor and Harmon case law from D.C. and the Second Circuit suggests that the NTU test should also apply to counts three and four. The court applied the Pinkreen test. But even if this court decides to apply the Pinkreen test, we believe that the district court was still wrong in its analysis. Turning then to where the district court was wrong on the issues of qualified immunity, we again direct the court's attention to the Mansour v. Trank as to counts one and two. Mansour is a case in which it's actually very similar to this case. In Mansour, an officer is relieved of duty after criticizing the department policy, and he's allowed to return under a written plan that provides he must refrain from all communications criticizing the city, department, management. The court construes the plan to mean what it says within the four corners, and it applies a hypothetical approach to look at what sort of speech may be regulated by this plan. The court ultimately said on the qualified immunity issue that qualified immunity was denied to the department because the department had no interest in restricting the clearly protected speech covered by the policy. We believe the same sort of analysis should apply in this case. The department had no interest in making this policy as broad as it made it, and therefore qualified immunity would be defeated. As to municipal liability, we have to judge the city separately from what we judge the department. The city was sued as a party. The department is here because Dixon was sued in his official capacity. This was clearly a department policy, so municipal liability should attach to the department. The city claims this was not a city policy but fails to explain how that can be. There is no further action necessary to make this general order effective and applicable. This general order was a policy of the department, a city agency, and it was established under the local ordinance allowing the chief to command and supervise the department. I see my time is up, so I will return on rebuttal.  Ms. Winneberger. Good morning, and may it please the court. I am Leslie Winneberger. I'm here with my colleague, Bill Etherington, on behalf of Chief Dixon and the city of Petersburg. I'd like to address first off the questions that were raised about this distinction between the facial challenge versus the as-applied challenge and whether or not the district court actually applied the right reasoning to these counts. These counts really create an artificial distinction between the two that doesn't represent reality in this case. Did the district court, in your view, apply the right standard? It did. Why? First off, it cites the Harmon case, where they talk about how under the Pickering and the NTEU test, the distinction between facial and as-applied constitutional challenges really becomes unimportant. Rather, the concerns that would lead the court to invalidate a statute on its face may be considered in the balancing test. So the first thing the court did was the threshold question of whether or not the speech at issue was a matter of public or private concern. With regard to Richards, it found that his statements were a matter of private concern, and therefore it never got to the balancing test. And the reason I say the distinction is really artificial is because the facial challenge operates on the premise that speech is chilled. And in this case, there's no evidence on the record that anyone's speech was chilled up until this particular point. And obviously, Mr. Richards and Mr. Liverman Was this provision cited in connection with the disciplinary action taken with respect to the two offices? It was. It was. But the distinction I'm trying to make is that the speech was not chilled for Mr. Liverman, Mr. Richards, or even Mr. Jones, the other officer involved in this Facebook posting. So we're really talking about whether or not the comments that they made are a matter of public or private concern. And that leads me to whether or not Richards' statements were a matter of public or private concern. And I submit that they were a matter of private concern, and so they were not entitled to First Amendment protection. Of course, whether speech is a matter of public or private concern is a question of law for this court. And while speech by public employees frequently address issues of concern to the public, that doesn't give an employee license to talk about their complaints with the job. Nor to dictate... One of the concerns that I have is I think this negative comments provision is just flatly unconstitutional. I mean, it almost seems to prohibit any kind of negative speech about the department leadership or the department's practices. And there is language from NTEU that says where you act pursuant to a ban that chills speech before it occurs. In other words, the Supreme Court seems to me to be particularly concerned about prior restraints here. And so let's say, I'm not asking you to agree with me, but let's just say that the negative comments provision is very problematic. I'm just saying, assume that arguendo. Where do we go from there? Why wouldn't we say to the district court that you've got to look at these broad bands of speech that chill them a priori before the speech is ever ordered? Because that's the kind of tool that a police department could use to shut off any adverse criticism. And it seems to me that an argument can be made that NTEU standards should be driving the case. Because even if it didn't chill the particular speech involved,  and also when you cite this provision in disciplining the individual employees, that sends a message throughout the workplace. And so there's this distinction because most disciplinary actions or a great many disciplinary actions are taken just in response to a particular incident. I'm just saying this violates department policy. But here you have something different, don't you? I understand what you're saying, but I don't think we do have something different. And the reason I say that is because I think the social networking policy, which I admit is not particularly well written, because the law is hard to articulate in this particular area. But I do not think it's unconstitutional. And the reason I say that is because the appellants have tried throughout this case to piecemeal the policy. And I think you have to look at the policy as a whole. Now, it did state that negative comments on department operations or certain conduct of supervisors or other employees was not protected by the First Amendment. When they impacted the public's view of the department. But it also went on to explain that employees could comment on matters of public or private concern. But imagine if we didn't demonstrate our concern here and police departments across the country were to pass these negative comment sections. And it says, negative comments on the internal operations of the Bureau or specific conduct of supervisors or peers that impacts the public's perception of the department is not protected by the First Amendment. And that seems to me to include practically everything that could be critical of a police supervisor or a department practice. And if you think about it, if the reaction is, oh, the Fourth Circuit put its imprimatur on that, no problem. But you do want a certain amount of discussion. It's not unlimited by any means, but you do want a certain amount of discussion and transparency about the way police departments are operating. And I haven't seen something like this that is this overbroad. And so I'm wondering if a failure to apply the NTEU standard here, which differentiates between isolated disciplinary actions and broad a priori prohibition of speech, prior restraints, whether the district court should have a chance to look at it in light of the distinction between those two forms of public employee speech. Well, I think what the court needs to look at, and you're really talking about this balancing of interests between what an employee can say, a public employee, and the public employer's interests in running an efficient operation. I think first you have to look at the environment. We're talking about police. This court has actually said they're at the restricted end of the spectrum because they're paramilitary. Discipline is demanded, and freedom must be correspondingly denied. And basically, a police department should be given greater latitude in dealing with dissension. Agreed. And that's an important point that you make. But can you point me to a case where any court has been faced with something like a negative comments provision  Is there anything like this out there? With this particular fact pattern, I'm not aware. But has any other department passed something like this? I mean, they need a lawyer to talk. Right, right. Let me just ask you a question. Perhaps you can help me with this. Counts 1 and 2 bring a facial challenge to the policy. Just the policy. The policy as written, regardless of any other facts, is unconstitutional. But it seemed to me that the district judge, in ruling on that, incorporated into his analysis whether or not the actual remarks in this case were violative of the policy. And to me, that's an incorrect way of analyzing a facial challenge to incorporate in your analysis what was actually said as it relates to that policy. And that's the problem of God. If it's a facial challenge, you just look at the language of the policy regulation. But he didn't do that. He incorporates into his analysis what these people actually said. So why isn't that wrong? Why doesn't a new analysis have to be done where you look solely at the policy? Solely at the policy, meaning this negative comments section. Policy, right. Like I said, it's an artificial distinction here, in the sense that the employees that brought this suit, their speech was not chilled. They spoke, even though they knew that the social networking policy. Now you want to incorporate what actually happened in this case. And my question is, is this a facial challenge? You just look at the policy. As it's written, regardless of what happens, as it's written, is it unconstitutional or not? Without regard to how it affects the individual plaintiffs in this case. Well, in this case, I think then the court has to look at what the speech is that's being chilled. And in this case, we're talking about this negative comments that reflect somehow unfavorably on the department. Negative comments provision was the basis for the disciplinary action. It was. But I believe that was also the appellant's argument as to why this policy was unconstitutional. That it was a blanket prohibition on all negative comments about the department. And I don't think that's true. I think this policy was actually saying that you can't make negative comments about the police if somehow it affects the public's perception and affects our operation. To follow up on Judge Traxler's question, if you have a policy that is facially unconstitutional, can you then utilize that policy to take action in individual cases as a basis for taking action in an individual case? Because I think it's a very good question. And it affects Richardson's claim. I mean, Richard's claim. Let me make sure I'm understanding your question. Answer his question. Forget what I said. Okay. So what you're asking me is if the social networking policy is found unconstitutional, can then the employer discipline someone under that policy if it's found unconstitutional? I think the answer is yes with regard to Richard's. Because Richard's comments, regardless, are a matter of private concern that are not protected by the First Amendment. So the disciplinary action with respect to Richard's was not taken pursuant to the negative comments provision? I believe that the department could take action against him regardless of whether the policy was in place. On what basis? On the basis that what they've done has affected the efficient operation of the ‑‑ well, actually, because it's not a matter of First Amendment protection. They could discipline him even if the policy didn't exist? I think they could. All right. But as I see where the court is leaning, I'd also argue, of course, that Chief Dixon is entitled to qualified immunity with regard to the policy. First Amendment law is very difficult to articulate because ‑‑ With respect to Livermore, you have this negative comments thing and actions taken with respect to the negative comments provision and it's taken with respect to comments, which at least to me seem very much directed to a matter of public interest. Richard's is a more difficult case for me. And you said you don't see any other case with a policy like this, but you're saying that notwithstanding the facial unconstitutionality of it, that they can still take action under the general theory that speech, which is disruptive of the workplace and is not, that would be a constitutional action. If a department decided that speech was disruptive of the workplace and not a matter of public concern, even if it cited the negative comments provision, that it was still independently outside the parameters of First Amendment protection. Yes. And what's your support for that? Well, looking at the speech that Richard used, if you look at his Facebook comments, he starts out by complaining about a certain supervisor that he can't give respect to because he only has one and a half years of experience. There's no mention that this supervisor does his job poorly. Livermore comments that these supervisor positions have been devalued and worthless, and he even states on the face that this is beyond questions of public safety. Richard responds back by bad-mouthing Chief Dixon. He uses phrases like, It's disgusting and makes me sick to my stomach daily. The next four years can't get here fast enough. From what I've been seeing, I don't think I can last, though. These all indicate Richard's personal complaints, a disgruntled employee, and not matters of public concern. So your view is that they would have been able to take action against Richard regardless. Yes. But they might not have been able to take action against Livermore in the absence of negative comments. Well, actually, I think I misspoke when I said that. You concede that. I concede that because of Livermore's first comment. But if you look, he actually made two Facebook postings, and he was not disciplined for the first Facebook posting that it was allegedly referring to an FBI report. He was only actually disciplined for his second comment, where he actually states on its face, This is beyond questions of officer safety. These positions have become, you know, devalued and worthless. That, again, I think is a comment by a disgruntled employee, and he says as much, that he's not speaking about anything that would be a matter of public concern. Was there reference to the negative comments policy in connection with Richard's disciplinary proceeding? With Richard's, I do not believe so. I think the negative comments may have only been referenced with regard to Livermore. There was no reference that they didn't say, We're disciplining you, Mr. Richards, because you violated the negative comments policy? I don't believe so. It's not in the record. It is in the record, but I just can't recall at this moment who was who. You're representing to me that that had no, that they didn't indicate, that there was no case that they took action pursuant to the negative comments policy? I think I'm not understanding your question. You're saying that the disciplinary action taken with respect to Richards was wholly independent of the negative comments policy? No, I wouldn't say it's wholly independent, but I cannot recall on the form that they gave him at the beginning. Let me ask the question another way. Sure. What part did the negative comments policy play in Richard's disciplinary action?  They did. They did to both of them. But I just can't remember. I think in each case they cited a different portion of the policy, and that's what I'm not recalling at the moment. But I think, going back to what the court was trying to get me to answer, was whether or not Richards and Livermore could be disciplined independently if this policy had never existed. And I think the answer is yes, because I think an employer doesn't have to wait around. But if the policy was cited as a reason for the discipline, then the question of independent reasons becomes a hypothetical? I don't think it's a hypothetical. I think it's just a matter of an employer saying enough's enough. Now hold on a second. Any further questions at all? I have questions for the other lawyer, but not this lawyer. Pardon? I have questions for the other lawyer, but not this lawyer. Okay. Thank you. Thank you for your time. Thank you, Your Honors. I can make several points to help clarify a lot of the questions that you had. First of all, Joint Appendix 427-428 answers the question about which policies were applied. It was the same negative comments applied to both Richards and Livermore. That's Joint Appendix at 427-428. Regarding the fact that Richards and Livermore were a disgruntled employee. Can you read that section to me? 427, violation of Bureau policy. This is under Number 8 on that page for Richards. General Order 400-23, Social Networking, Number 4, Procedures, Paragraph 4. Negative comments on the internal operations of the Bureau or specific conduct of the supervisors or peers that impacts the public's perception of the Department is not protected by the First Amendment Free Speech Clause in accordance with the established case law. That's on Richards' disciplinary form. Let me ask you. I'm going to get you to switch gears. My question has to do with retaliation. Yes. With regard to Mr. Livermore. It seemed to me that one of the things he got disciplined for, he was the author of his own dilemma. In other words, his lawyer asked for some particular records. Defendants pull the records, and then find out he's been fooling around, and he gets disciplined for that. How can that be retaliation? I understand the question. First of all, the appropriate question is, what records did they pull? If you look at the records we requested and the records they pulled, they're not the same records. They're different date ranges. Explain that to me. The records that we requested are not the records that they used as the basis here. They're different date ranges. They did not pull the records that we were requesting. They pulled some other records. They could not reasonably have pulled them in response to your request. No, I'm not saying that they could not reasonably have pulled them. But they ultimately took the opportunity to use this as an opportunity to investigate him. We're not saying that the discipline of him, or that he shouldn't have been disciplined. We're not saying that. But what we're saying is that starting an investigation, and then starting a subsequent investigation, evidenced the fact that they were actually motivated by retaliation for his threat to file a lawsuit, and that they were acting under this. The retaliation, I thought, was dismissal of the two officers. No. Liverman resigned, I thought. Liverman ultimately resigned in lieu of being terminated. What we point to is the whole course of conduct, including initiating those investigations. Initiating an investigation. If we say that's retaliation, then what you've done is you've immunized these two people from any kind of investigation, even for independent infractions. I thought one of them was investigated for sexually explicit emails, and another one was investigated for a failure to be at a duty post at the assigned time. Those particular infractions were, it seems to me, independent of any kind of speech. What I'm worried about, I'm always worried about in a retaliation case, is that somebody does something that admittedly is protected activity, but then they regard themselves as closed with immunity against any subsequent sanction or any subsequent investigation. There's a real danger in your view of retaliation here of tying the department's hands. I assume my time has expired. May I respond briefly? Yeah, sure. I absolutely agree. There is reason to be concerned. There is reason to take that cautious approach. This claim would not be here unless we saw four internal affairs investigations against two officers over a period of four months, which included things like the chief ordering Liverman to be disciplined for leaving a duty post without an investigation happening first. Unless we saw things like broad investigations, unless we saw things like Richards being disciplined for something that was entirely related to the complaint that was filed, those sort of things make us concerned that this, in this instance, was pretextual retaliation. The court, though, is right to be concerned. We appreciate the court's time. Thank you very much. Thank you. We'll come down and greet counsel and take a brief recess.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., Bruce H. Hendricks